**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| RODNEY BABBS, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:15-cv-0194-DGK |
| | ) | |
| BRYAN BLOCK, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING IN PART DEFENDANT'S MOTION TO EXUDE EXPERT TESTIMONY

This lawsuit arises from a shooting outside of a nightclub. A bouncer at the club, Plaintiff Rodney Babbs, Jr. ("Plaintiff"), ejected an off-duty police officer, Defendant Bryan Block ("Defendant"), from the premises. Shortly afterward, a scuffle occurred outside the club during which Defendant shot Plaintiff.

Now before the Court is Defendant's Motion to Exclude Expert Testimony (Doc. 123). Defendant seeks to exclude the testimony of Plaintiff's experts Dr. Steven Simon, M.D., Rph[1]; Mr. Michael Dreiling; and Dr. William Gary Baker, Ph.D. For the following reasons, the motion is GRANTED IN PART.

### Standard

When the admissibility of expert testimony is challenged, the district court must make "a preliminary determination of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). The party seeking to introduce the expert's testimony bears the burden of establishing its admissibility by a

---

[1] "Rph" is an acronym for a registered pharmacist.

preponderance of the evidence. *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).

Under Federal Rule of Evidence ("FRE") 702, a witness may give an expert opinion if the following conditions are met:

> (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In other words, the proponent must show that the expert's opinions are relevant, the expert is qualified to offer them, and "the methodology underlying his conclusions is scientifically valid." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757-58 (8th Cir. 2006). Doubts should be resolved in favor of admissibility. *Id.* at 758.

The Eighth Circuit has repeatedly observed that, as a general rule, "'the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility,'" but "'if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded.'" *Lawrey v. Good Samaritan Hosp.*, 751 F.3d 947, 952 (8th Cir. 2014) (quoting *Neb. Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 415 (8th Cir. 2005)).

## Discussion

### I. Most of Dr. Simon's opinions are inadmissible.

Dr. Simon is a medical doctor who specializes in physical medicine, rehabilitation, and pain management and pain disorders. Plaintiff retained him to testify in this case, and he wrote two short letters which serve as his expert reports.

**A.      Dr. Simon's reports.**

**1.      The September 30, 2016, report.**

The first letter is dated September 30, 2016, and titled "Independent Medical Evaluation – Part 2." It is based on Dr. Simon's interview and physical examination of Plaintiff. The letter begins with the following summary of the event and Plaintiff's symptoms:

> He reports being a bouncer in a nightclub and at that time was outside the club with an unruly patron and he was attempting to subdue the patron when the patron pulled a gun and shot him twice. One shot was apparently abdomen through the back, the other was a back through the abdomen or the back through the side. Regardless, these were clean shots which did not impair him to the point that he was not able to subdue the man and ultimately [sic], then went back into the shop and was sent to the ER. At the ER, his wounds were dressed. Apparently, he was given the opportunity to stay in the hospital for observation or leave. He chose to leave and he returned the next day to the emergency room for a checkup. He has had no surgery but did have a seroma develop under one of the abdominal wounds and had this drained.

> He has had several problems since the shooting itself which includes pain shooting down both legs to his feet. He had a lot of numbness in his feet that has become somewhat better and he has had a lot of stomach cramps. This occurs while he is driving and this occurred a lot until the seroma was removed and then it became somewhat better. He is having subconscious thoughts and feelings that bad things will happen to him in that someone is going to "mess him up good" and these thoughts occur at various times, including today when filling out forms for us. He has never had this happen before.

> He has a lot of hip pain getting in and out of cars. He also has pain that shoots from his hip to his low back pain and when he is going to get up from a car is when that type of pain happens and the pain will also go into his legs. He lets that pain occur and then he will experience that pain for several steps before it ultimately goes away.

> He has been to the ER recently for chest pain and was told after x-ray that he has a number of bullet fragments left in his body that is causing that pain.

Rep. dated Sept. 30, 2016, at 1-2 (Doc. 123-2). This is followed by a "Past Medical History" section which states:

> Negative for any of this type of problem. He did have some problems with hypertension and has had a hearing loss developing in one ear and now the other for which he uses a hearing aid. He took a lot of over-the-counter Aleve for his pain and had some gastric problems and had to quit taking that. Now he uses over-the-counter products, either acetaminophen or aspirin products.

*Id.* at 2. It does not mention a 2006 episode when Plaintiff was also shot twice. The letter also contains a three-sentence social history and a few paragraphs describing Dr. Simon's physical exam and findings.

The letter concludes with three paragraphs stating Dr. Simon's opinions and the basis for them:

> While I have not had the opportunity to review the records in this case, it is clear this patient sustained gunshot wounds. These wounds are visible and it is consistent that he would have retained fragments to one of the bullets where no exit wound was found. This is consistent with an irritation to the nerve outflow of most likely the lumbar plexus of nerves as irritated by the wound itself. It is unclear if the decrease in girth of the right leg is part of that process. Also, the patient reports he has had some balance issues where he feels off balance and it is possible that this is a proprioceptive abnormality but we would have had to see injury to the spine by bullet and I have not had the opportunity to review those records at this time.

> It is worthwhile to note that the patient has four-extremity discomfort. He has numbness in his forearms. He has pain in the right upper chest and midchest region. He has pain across the buttock and pelvic brim area and a lot of bilateral lower extremity

numbness, paresthesias and aching which include the feet and the
mid to lower legs.

I will be adding to the opinions following the full review of
records.  Please let me know if I can be of further information in
this regard.

*Id.* at 2.

### 2.    The October 7, 2016, report.

The second report is a two-page letter dated October 7, 2016, titled "Independent Medical

Evaluation – Part 1."  This letter is based on a review of medical records from eight different

sources.  Each source of medical records is summarized and described in a few sentences.

Relevant to the pending motion, these descriptions are as follows:

1.  Research Hospital 03/05/2011.  This is an ER visit.  Admitted
with multiple trauma.  Gunshot wound x2.  This was noted to be in
the chest and in the back as well as the flank.  There were 2 low
back wounds documented and abdominal wounds as well.  A CT
chest was run on 03/05/2011.  That report showed fragments were
in the right upper anterior chest wall and there was some skin
emphysema.  There was a question of whether these were acute or
possibly old.  There were right posterior gluteal soft tissue as well
as soft tissue emphysema, a soft tissue wound with fragments and
the impression was that this was soft tissue gunshot wounds.  A
chest film was consistent with old bullet fragments in the right
axillary area and the rest of the organs checked out okay.  Another
chest x-ray showed overlying fragments around the right scapular
region.

. . .

4.  Midwest Trauma saw the patient acutely, did followups on
3/17/2011, draining a right chest wall seroma and noting an acute
stress reaction was setting in which decreased sleep and frequent
thinking about the situation itself.  On 3/31/2011, the gross note
was that patient was improving with his soft tissue gunshot wound
injuries.

.  .  .

6.  Records from Dr. Fernando Egea, M.D. 05/11/2011 addressing gunshot wounds and diagnosing radiculopathy.

.  .  .

8.  Research Hospital ER records from 2/28/2006 show an emergent admission for gunshot wound to the right arm and right chest.  There was also right eye abrasion at the forehead and bilateral knee abrasions.  That included gunshot wound to the right arm and right chest.

Rep. dated Oct. 7, 2016, at 2 (Doc. 123-2).  The letter closes with Dr. Simon's conclusions.

Having seen Mr. Babbs and examined him, I do believe that I would add the diagnosis of PTSD exhibited by his thoughts that someone is going to hurt him.  These thoughts are very threatening to him and this was noticed first in 03/2011 back at Midwest Trauma Physicians and they have really never gone away, according to patient.

I do believe now after this review of records that the pains that the patient has in the hip area are generated from nerve tract disease indicating neuroma and/or nerve entrapment related to the path of the gunshot wound or its bullet fragments as well creating this referred pain toward the hip region and down the legs.

I do not have electromyographic studies to confirm the radiculopathy that was mentioned by other physicians but this certainly is a radicular pattern and at least clinically, he has that diagnosis.

I think it should be pointed out again related to the PTSD that the anxiety that he has regarding these ruminations of the event itself are very typical of producing anxiety in these patients with chronic pain as we are seeing here and therefore, we are adding a diagnosis of a chronic pain syndrome related to the gunshot wound as well.

Please let me know if I can be of further information in this regard.

Rep. dated Oct. 7, 2016, at 2 (Doc. 123-2).

### 3. Dr. Simon's opinions.

After carefully reading and re-reading Dr. Simon's expert reports, the Court understands Dr. Simon to be asserting five opinions.[2]  They are:

1. The March 5, 2011, gunshots ("2011 gunshots"), or bullet fragments from one of these gunshots, caused nerve tract disease in Plaintiff that is responsible for pain in his hip and low back region, and referred pain felt down his legs.

2. Based on other doctors' reports, Dr. Simon suspects Plaintiff has radiculopathy that was caused by the March 5, 2011, gunshots.  Dr. Simon cannot confirm this diagnosis because no electromyographic studies have been performed.

3. Plaintiff is suffering from four-extremity discomfort.

4.  The 2011 gunshots caused Plaintiff to develop post-traumatic stress disorder ("PTSD").

5. The 2011 gunshots caused Plaintiff to suffer chronic pain syndrome.

### B. Analysis

Defendant moves to exclude all of Dr. Simon's testimony, arguing: (1) his opinions are not supported by sufficient facts or data; (2) his opinions are not the product of reliable principles and methods; (3) his opinions will not assist the jury in understanding the evidence or in determining a fact issue; and (4) his testimony should be excluded because this Court previously found, in a case appealing the denial of Social Security Disability benefits, that the

---

[2] The September 30th letter mentions a potential sixth opinion, namely that it is "possible" that the March 5, 2011, gunshots could be responsible for some balance issues Plaintiff is having.  Dr. Simon qualified this opinion by stating "we would have had to see injury to the spine by bullet and I have not had the opportunity to review those records at this time."  Dr. Simon issued his October 7th letter after reviewing Plaintiff's medical records, and the October 7th issue does not mention any balance issues.  Consequently, it appears Dr. Simon abandoned this theory.

administrative law judge did not err in declining to give great weight to Dr. Simon's opinion.[3] Defendant contends Dr. Simon provided little explanation for his diagnosis of chronic pain beyond that it is "related to the gunshot wound." Defendant also criticizes Dr. Simon's methodology for failing to conduct a differential diagnosis to determine if Plaintiff's previous gunshot wounds could be responsible for any pain. Defendant cites the report of his own retained expert, Dr. Richard Dubinsky, M.D., a doctor and professor of neurology at the University of Kansas Medical Center, who opines that Dr. Simon's conclusions are not grounded in medical fact.

Plaintiff responds that Defendant's arguments go to the credibility and basis of Dr. Simon's opinion, not its admissibility. Plaintiff characterizes Defendant's argument as a complaint that his Rule 26(a)(2) disclosures were insufficient. Plaintiff contends Dr. Simon's report complies with Rule 26(a)(2), and that if Defendant felt the report was insufficient, he should have raised the issue by requesting a discovery dispute teleconference under Local Rule 37.1. He also notes Defendant could have deposed these experts to learn about the factual basis for their opinions, but did not do so.

As a threshold matter, Defendant's motion to exclude is more than a mere discovery dispute: Defendant is arguing that Dr. Simon's opinions are not admissible under F.R.E. 702. Although Defendant is citing deficiencies in Dr. Simon's expert report to argue his opinion is not supported by sufficient facts or data and that there are flaws in his methodology, this does not bring the motion within Local Rule 37.1's ambit.

---

[3] This fourth argument is unavailing. A finding that an administrative law judge did not err in declining to give greater weight to a physician's opinion is not analogous to a judge refusing to allow a physician to testify as an expert witness because his opinion is fundamentally unsupported. The former says nothing about the physician's capacity to testify as an expert witness.

Additionally, it is a close call whether Dr. Simon's reports comply with Rule 26(a)(2). Rule 26(a)(2)(B) states a report must include: any exhibits the witness will use to support his opinions; the witness's qualifications; a list of all other cases during the last four years in which the witness testified as an expert at trial or deposition; and a statement of the expert's compensation. Fed. R. Civ. P. 26(a)(2)(B)(iii)-(vi). Dr. Simon's reports do not contain any of this information. More importantly, Rule 26(a)(2)(B) also states a retained expert's report "*must* contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) and the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). Assuming his reports contain all his opinions,[4] the explanation given for these opinions is so truncated that the Court doubts whether it contains the complete basis and reasons for his opinions. Plaintiff essentially admits this when he suggests that if Defendant wanted to know the factual and medical basis of Dr. Simon's opinions, he should have taken his deposition.

Assuming for the sake of argument Dr. Simon's reports comply with Rule 26(a)(2)(B), his reports lead the Court to question whether his opinions are generally supported by sufficient facts or are the product of reliable methods. For example, his reports are almost silent with respect to a crucial event in Plaintiff's medical history, the 2006 shooting. Dr. Simon does not consider whether these wounds could be a contributing cause of Plaintiff's pain, even though in 2006 he was shot in the right arm and right chest, and the emergency room records from the night of the 2011 shooting question whether the bullet fragments found in Plaintiff's "right upper anterior chest wall" and "right scapular region" were from the earlier shooting. As best the

---

[4] Expert reports typically contain an opinion section which clearly identifies each opinion and explains the reasoning behind it in detail. *See, e.g.*, Dr. Chunings Rep. 4-7 (Doc. 123-5). But Dr. Simon's opinions are set forth in a rambling mixture of conclusions and explanations which makes it difficult to tell what his opinions are, much less whether his reports contain a complete statement of all his opinions.

Court can tell, Dr. Simon simply assumes that all of Plaintiff's medical problems stem from the 2011 shooting. The Court's concern here is not what Dr. Simon's opinion is, but the factual basis for it and the methodology Dr. Simon used in reaching it. Dr. Simon appears to have reached his opinion without considering what role the prior gunshot wounds may have had. This is not sound methodology.

The lack of discussion in Dr. Simon's report also potentially limits the scope of his trial testimony. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information" required by Rule 26(a), it "is not allowed to use that information . . . at a trial, unless the failure was substantially justified or is harmless."). Since he did not address the prior gunshot wounds in his expert report, the Court is reluctant to let him opine on their significance—or lack of significance—during direct examination at trial.

Turning to the admissibility of Dr. Simon's particular opinions, the Court rules most of his opinions are not admissible. His first opinion—that the 2011gunshots, or bullet fragments from one of these gunshots, caused nerve tract disease in Plaintiff that is responsible for the pain in his hip and back region, and referred pain felt down his legs—is admissible because it is relevant, Dr. Simon is qualified to offer it, and the methodology underlying his conclusions is scientifically valid. Although Defendant's expert criticizes the basis for this opinion, these objections go to the credibility of Dr. Simon's testimony, not its admissibility. *See Lawrey*, 751 F.3d at 952. While Dr. Simon's explanation is threadbare, there is enough discussion of hip, back, and leg pain in the medical records he references and in his own explanation that the Court cannot say his opinion is so fundamentally unsupported that it can offer no assistance to the jury. Thus, he may testify about his first opinion.

As for Dr. Simon's second, third, fourth, and fifth opinions, the Court holds they are not admissible because they are not supported by sufficient facts or data, nor are they the product of reliable principles and methods. Dr. Simon's second opinion is that Plaintiff suffers from radiculopathy caused by the 2011 gunshots. Dr. Simon and Dr. Dubinsky strongly disagree about whether the methods Dr. Simon relied on to reach this diagnosis have a sound basis in medical fact. While Dr. Dubinsky appears to be more qualified to testify about neurological matters, and his report is more comprehensive and persuasive, his criticisms are not a basis to exclude Dr. Simon's testimony. *See id.* But both experts agree about two things: (1) the only way to confirm a diagnosis of radiculopathy is to have an electromyographic study performed, and (2) no such study was ever conducted on Plaintiff. Dr. Simon's willingness to diagnose radiculopathy in the absence of an electromyographic study, combined with his other shortcomings (lack of experience in neurology, examination methods, etc.), is concerning. But, assuming Plaintiff has radiculopathy, Dr. Simon does not explain how the 2011 gunshots caused it. Hence, the Court finds Dr. Simon's opinion is not supported by sufficient facts and his methodology is unsound, therefore this opinion should be excluded. *See id.*

Dr. Simon's fourth and fifth opinions, that the 2011 gunshots caused Plaintiff to develop PTSD and chronic pain syndrome, are also fundamentally unsupported. According to Dr. Simon's report, his PTSD diagnosis is based on the fact that Plaintiff told him that he has been thinking that "someone is going to hurt him" since the 2011 shooting, and these thoughts have not gone away. This is all the evidence he offers for this diagnosis. While this might be a good reason to investigate further whether Plaintiff might have PTSD, it is not a sufficient basis on which to form an opinion that Plaintiff has PTSD, or that the 2011 shooting caused it. Dr. Simon is not a mental health expert, nor does he have any expertise in diagnosing PTSD. He did not

review any records from mental health experts who evaluated Plaintiff for PTSD, nor does his report discuss the relevant criteria that would support a PTSD diagnosis and apply those criteria to Plaintiff. Assuming for the sake of argument Plaintiff has PTSD, Dr. Simon's report does not consider or discuss other possible causes for any PTSD, such as the 2006 shooting, or the cumulative effect of having been shot on two separate occasions. Hence, this opinion is not supported by sufficient data, nor is it the product of reliable principles and methods.

Dr. Simon's opinion that the 2011 gunshots caused Plaintiff's chronic pain syndrome is similarly flawed. Dr. Simon reasons that Plaintiff probably has chronic pain syndrome because the anxiety he is experiencing is "very typical" in patients who also have chronic pain syndrome. Rep. dated Oct. 7, 2016, at 2 ("[T]he anxiety that he has regarding these ruminations of the event itself are very typical of producing anxiety in these patients with chronic pain as we are seeing here and therefore, we are adding a diagnosis of a chronic pain syndrome related to the gunshot wound as well."). Notably absent from this analysis, however, is any explanation of what chronic pain syndrome is or how it is diagnosed, any discussion of the specific facts or data which led him to this diagnosis,[5] or consideration of evidence which might be incompatible with such a diagnosis.[6] The Court is also troubled that Dr. Simon has not employed any techniques, such as a differential diagnosis, which might rule out other possible sources, such as the 2006 gunshots, as the cause of any chronic pain. Although a differential diagnosis is not required, the absence of one here is concerning. *See Bland v. Verizon Wireless, L.L.C.*, 538 F.3d 893, 897 (8th Cir. 2008) (noting a proper differential diagnosis would, by itself, satisfy *Daubert*). It reinforces

---

[5] There is no discussion of how intense Plaintiff's anxiety is or how long he has experienced it, or what Dr. Simon means by anxiety "typically" being found in PTSD patients who have chronic pain syndrome. Does this mean forty percent of PTSD patients who have anxiety also have chronic pain? Ninety percent?

[6] For example, Plaintiff reports he treats his pain by using over-the-counter medication only. The Court does not know if this is consistent with someone who has chronic pain syndrome, but the Court expects an expert witness would address this question in his expert report.

the Court's conclusion that this opinion is fundamentally unsupported. Hence, Dr. Simon's fifth opinion is inadmissible.

Plaintiff's argument that Defendant could have deposed Dr. Simon to learn more about the factual and medical basis for these three opinions, or ordered his own electromyographic study of the Plaintiff to confirm whether he has radiculopathy, is unavailing. Sure, Defendant could have done these things, but why would he? FRE 702 places the burden on the proponent of the expert testimony to demonstrate its admissibility, and Rule 26(a)(2)(B) requires the retained expert to disclose all the facts and data considered by the expert in forming his opinion. If an expert does not write a report demonstrating the admissibility of his opinion, the opposing party is under no obligation to spend time and money taking his deposition.

Finally, the Court holds Dr. Simon's third opinion—that Plaintiff suffers from "four-extremity discomfort"—is not admissible. Dr. Simon intimates this pain is somehow linked to the 2011 gunshots. But the report does not state the 2011 gunshots actually caused the four-extremity discomfort, much less explain how they caused it. Whether Plaintiff suffers from "four-extremity discomfort" is relevant only if Defendant directly caused or directly contributed to cause it, or if Defendant's actions aggravated any pre-existing conditions Plaintiff may have had. *See Lockhart v. United States*, 834 F.3d 952, 955-57 (8th Cir. 2016) (discussing liability under Missouri law where there are multiple causes of damages, pre-existing conditions, and aggravation of pre-existing conditions). Because Dr. Simon does not opine that the 2011 gunshots caused this condition, his opinion will not assist the trier of fact determine a fact in issue, and so it is not admissible.

In summary, Dr. Simon's testimony is limited to his opinion that the 2011 gunshot injuries are responsible for the pain felt in Plaintiff's hip and back region, and the referred pain

felt in his legs.  Further, because Rule 26(a)(2)(B) provides that an expert report "must contain a complete statement of all opinions the witness will express and the basis and reasons for them, and the facts or data considered by the witness in forming them," Dr. Simon cannot bolster his trial testimony on this point with facts, theories, or methodologies not disclosed in his expert reports.

## II.    Mr. Dreiling's testimony is admissible under FRE 702.

Mr. Dreiling is an expert in the field of vocational rehabilitation.  He opines that because of a combination of factors—Plaintiff's lack of any formal academic or vocational training beyond high school, his limited computer skills and inability to type, his history of physically oriented work, and his numerous medical problems (hearing loss, PTSD, chronic pain syndrome, hip and back conditions, the 2006 and 2011 gunshot injuries, etc.)—Plaintiff is "essentially and realistically unemployable in the open labor market."  Dreiling Rep. at 10 (Doc. 123-3).

Defendant moves to exclude all of Mr. Dreiling's testimony, arguing it is premised on a medical determination that the 2011 gunshots caused the injuries preventing Plaintiff from working.  Defendant contends that neither Dr. Simon, or any other doctor identified to testify in this case, have placed any limitations on Plaintiff's ability to work that are directly attributable to the wounds he received on March 4, 2011.  Defendant does not dispute Mr. Dreiling's qualifications or his methodology, but argues his testimony will confuse or mislead the jury into believing there is medical evidence linking Plaintiff's 2011 gunshot wounds to his present inability to work.

To begin, the Court observes it anticipates[7] it will instruct the jury Defendant is only responsible for damages he "directly caused or directly contributed to cause," as well as for any

_____

[7] The Court will determine precisely how it will instruct the jury at a later time, after the parties have had an opportunity to brief the issue.

damages he caused by aggravating any pre-existing conditions Plaintiff may have had. *See Lockhart*, 834 F.3d at 955-57. The Court anticipates it will also instruct the jury Defendant cannot be liable for "conditions that are due entirely and wholly" to Plaintiff's "previous disease or injuries." *Id.*

Mr. Dreiling is qualified to testify about how a given set of health problems impacts a person's ability to work, and his methodology is sound. Thus, assuming Dr. Simon testifies that the 2011 gunshot wounds caused Plaintiff's nerve tract disease which is responsible for pain in his hips and legs, Dr. Dreiling's testimony will help the jury understand the evidence related to Plaintiff's ability to work, which in turn will help it determine damages. Accordingly, Dr. Dreiling's testimony is admissible.[8]

## III.    Dr. Baker's testimony is admissible under FRE 702.

Dr. Baker is an expert in economics whose proposed testimony will estimate "the present value of the income loss to [Plaintiff] resulting from his injury of March 4, 2011." Defendant's objections to Dr. Baker's testimony are similar to those he made to Dr. Dreiling's: that there is no medical testimony connecting Plaintiff's injuries from the 2011 shooting to a physical limitation on his ability to work. Since there is no evidence that the 2011 shootings limited Plaintiff's ability to work, Dr. Baker should not be allowed to testify about wages Plaintiff purportedly lost as a result of the 2011 shootings.

Plaintiff responds that Dr. Baker is a qualified expert, and that is opinion is premised on information provided by Plaintiff's counsel, which is normal for expert witnesses.

The Court holds that because Dr. Simon is permitted to testify that the 2011 gunshots caused nerve tract damage, and Mr. Dreiling can testify that nerve tract restricted Plaintiff's

---

[8] Of course, Mr. Dreiling may not testify whether the 2011 gunshot injuries caused a particular injury or health problem. Only a medical expert can provide such testimony.

ability to work, Dr. Baker may testify about the amount of income lost from nerve tract damage impinging his ability to work.

Plaintiff, however, will be limited to arguing economic damages supported by testimony linking Plaintiff's inability to work to injuries suffered in the 2011 shootings. Plaintiff will be prohibited from arguing Defendant is responsible for any restrictions on his ability to work caused by radiculopathy, four-extremity discomfort, hearing loss, PTSD, chronic pain syndrome, or other conditions not linked by admissible medical evidence to the 2011 shootings.

## Conclusion

For the reasons discussed above, Defendant's motion (Doc. 123) is GRANTED IN PART. Dr. Simon's testimony is limited to his first opinion and to the basis, reasons, facts, and data supporting this opinion set out in his report. Mr. Dreiling and Dr. Baker may testify, but they may not offer medical testimony.

**IT IS SO ORDERED.**

Date:  June 1, 2017

/s/ Greg Kays
GREG KAYS, CHIEF JUDGE
UNITED STATES DISTRICT COURT